UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-------------------------------------------------------------------x
                                            :
INTERNATIONAL BRANDS USA, INC. and          :
INTERBRANDS, INC.                           :
                                            :
        Plaintiffs,                         :   CIVIL ACTION NO.:
                                            :
v.                                          :   3:02 CV 00333 (MRK)
                                            :
OLD ST. ANDREWS LIMITED                     :
                                            :
        Defendant.                          :   MAY 12, 2004
                                            :
-------------------------------------------------------------------x
```

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.        PROCEDURAL BACKGROUND**

On February 26, 2002, plaintiffs International Brands USA, Inc. and Interbrands, Inc.

(collectively "International Brands") filed on eight count complaint against defendant Old St.

Andrews Limited ("OSA") invoking the Court's diversity jurisdiction.  The central claim alleged

in the complaint is that OSA unlawfully, improperly and unfairly terminated the parties'

exclusive distributorship agreement conferring upon International Brands the exclusive right to

distribute in the United States products produced by OSA, including a product bearing the name

Old St. Andrews Clubhouse Scotch Whisky.  The complaint also alleges that OSA failed to

reimburse International Brands for (i) defective goods, including goods returned to OSA by

International Brands pursuant to OSA's instructions and (ii) monies advanced by International

Brands to OSA.  The specific causes of action upon which International Brands now seeks

judgment are:

- Count One - a cause of action for breach of contract in which International Brands claims as its reliance damages an amount equal to the out-of-pocket expenses it incurred developing, promoting and advertising "Clubhouse products" during the period 1999-2001, less the profits International Brands earned on the sale of Clubhouse products during that same time period.

- Count Two - a cause of action for breach of the duty of good faith and fair dealing implicit in the parties' exclusive distributorship agreement. The monetary relief sought in Count Two is the same relief sought in Count One.

- Count Six - a cause of action for breach of contract based on OSA's failure to reimburse International Brands for defective and unmerchantable goods, including mislabeled goods returned by International Brands to OSA at OSA's request. International Brands seeks damages in the amount of the credit invoices it rendered to OSA for the defective goods.

- Count Seven - a cause of action for breach of contract based on OSA's failure to reimburse International Brands for monies advanced by International Brands to OSA, at OSA's request, purportedly for the purchase of bulk whisky needed to fulfill a 4,650 case order for Old St. Andrews Clubhouse Scotch Whisky ("Clubhouse") placed by International Brands in January 2001. International Brands seeks to recover the amount of the advance, less the price of the 1,200 cases of Clubhouse that were shipped to International Brands.

- Count Eight - a cause of action for violation of the Connecticut Unfair Trade Practices Act ("CUTPA") based on OSA's summary termination of the parties' exclusive distributorship agreement (and OSA's denial that such agreement even existed) after International Brands invested substantial time and money developing a market for products produced by OSA;

OSA's refusal to honor credits to which International Brands was entitled; and OSA's sudden demand for payment of expenses never agreed to by International Brands. International Brands seeks the same compensatory relief sought in the prior counts plus punitive damages and attorney's fees.

OSA appeared in this action by counsel and, on April 30, 2002, filed an answer, special defenses and counterclaims relating to International Brands' purchases of goods from OSA. Discovery thereafter proceeded in accordance with a court approved Case Management Plan.

On March 10, 2003, OSA filed a motion to amend its counterclaims to add four additional counts alleging violations of state and federal law in connection with International Brands' alleged efforts to register with the United States Patent and Trademark Office the name "Clubhouse" in connection with Scotch whisky (the "Additional Counterclaims"). OSA's motion to amend was granted on April 11, 2003 and International Brands thereafter filed an answer and special defenses with respect to the Additional Counterclaims. Discovery, including discovery on the Additional Counterclaims, continued in accordance with an amended Case Management Plan.

On November 3, 2003, International Brands filed a motion for summary judgment with respect to the Additional Counterclaims. By order dated November 18, 2003, the Court extended OSA's time to respond to the motion for summary judgment to December 8, 2003 and by order dated December 3, 2003 that time was further extended to January 9, 2004. However, in an effort to expedite the commencement of trial, International Brands agreed that consideration of the motion should be deferred until the time of trial which, by order dated December 17, 2003, was scheduled to commence on April 19, 2004.

On March 5, 2004, the Court was informed that OSA had commenced voluntary liquidation proceedings in the United Kingdom. On March 8, 2004, OSA's counsel filed a motion to withdraw appearance reciting conversations with both OSA's principal and the putative "liquidator" of OSA to the effect that OSA would not participate further in this action.

By orders dated April 2, 2004 and April 5, 2004 respectively, the Court granted OSA's counsel's motion to withdraw appearance and directed that International Brands would be free to move for entry of a default judgment if replacement counsel did not file an appearance on behalf of OSA by April 12, 2004. No such appearance has been filed and International Brands has now moved for entry of judgment.

## II.  PROPOSED FINDINGS OF FACT

### Facts Concerning the Creation of the Parties' Exclusive Distributorship Relationship

1.      Plaintiffs, International Brands USA, Inc. and Interbrands, Inc. (referred to collectively as "International Brands"), were at all relevant times Delaware corporations operating out of Farmington, Connecticut and engaged in the importation and distribution of alcoholic beverages in the United States. Andersen: 3.[1]

2.      Defendant, Old St. Andrews Limited ("OSA"), was, at all relevant times, a corporation incorporated under the laws of the United Kingdom which produced, through third party distillers and bottlers, alcoholic beverages, including Scotch whisky products bearing the name "Old St. Andrews." Andersen: 4; Defendant's Answer:  Pars. 2 and Par. 7.

---

[1]  References Andersen: __; Klim: __; Gorman __; Hillman __; and Kurzman: __ refer to the affidavits of Rolf Andersen, Matt Klim, Harold Gorman, Andrew Hillman and Marc Kurzman re Attorney's Fees, respectively.

3.      OSA's products were originally distributed in the United States by Shaw-Ross International Importers, Inc. ("Shaw-Ross"), a company formerly located in Miami, Florida. Andersen: 5.

4.      OSA and Shaw-Ross mutually terminated their exclusive distributorship relationship in or about 1988.  Andersen: 5.

5.      In or about May 1989, Rolf Andersen, the President of Interbrands, Inc. ("Interbrands"), and Robert Haswell, OSA's Chairman and majority shareholder, began discussions concerning Interbrands' "exclusive distribution" of OSA's products in the United States (and other territories).  Andersen: 6; Exhibits 1 and 2.

6.      One of the issues they addressed was Interbrands' purchase of Shaw-Ross' remaining inventory of OSA products.  Mr. Andersen advised Mr. Haswell that Interbrands would make such a purchase if, and only if, Interbrands and OSA "[had] some form of agreement."  Robert Haswell, in turn, acknowledged in writing his understanding that Interbrands would "only take over" any Shaw-Ross inventory of OSA products "subject to our final agreement being made."  Andersen: 7; Exhibits 3 and 4.

7.      In August 1989, Robert Haswell and Rolf Andersen reached agreement on the terms of their companies' relationship.  The essence of their agreement was the development by Interbrands of a market in the United States for products manufactured by OSA.  Interbrands would be appointed OSA's exclusive United States distributor and would be solely responsible for developing a market in the United States for products produced by OSA.  To this end, International Brands would be required to maintain an adequate distribution force and warehousing facilities and to purchase an adequate amount of such products to meet the demand of the market.  OSA, in turn,

would sell its products to no other United States distributor (with the exception of "duty free" shops) and would extend to International Brands discounts of its published price lists. Andersen: 8.

8.      The parties intended their agreement to be perpetual in duration; so long as Interbrands met its obligations to OSA in terms of developing a market for products produced by OSA and purchasing a sufficient volume of such products to meet market demand, the exclusive distributorship agreement would remain in effect. Andersen: 9.

9.      The parties' exclusive distributorship agreement was memorialized in a letter of appointment dated August 2, 1989 and executed by Robert Haswell. That letter, similar in form to the letters of appointment issued to International Brands by other manufacturers for whom it acted as exclusive distributor, formally appointed Interbrands as OSA's "exclusive agent for distributing OSA's products in the entire United States." Andersen: 10; Exhibit 5.

10.     The August 2, 1989 appointment letter was, under prevailing industry custom and practice, a typical and customary way of memorializing an exclusive distributorship relationship of this type. Andersen: 11; Gorman: 6(a), 8 and 9; Hillman: 5 and 8(a).

11.     Under prevailing industry custom and practice, absent express agreement to the contrary, exclusive distribution rights conferred upon an importer/distributor of scotch whisky products could be unilaterally terminated by the manufacturer/supplier without compensation only for good cause, meaning willful misconduct, false reporting, loss of importer's permit or unjustified failure to purchase products. Andersen: 11, Gorman: 6(b) and 9; and Hillman: 8(c) and 8(e).

12.     Furthermore, under prevailing industry custom and practice, if an exclusive distributor invested its own funds developing a market for a manufacture/supplier's products, and its distributorship rights were terminated by the manufacturer/supplier without cause, recovery of the

distributor's unamortized investment and/or anticipated lost profits was considered the appropriate standard of compensation.  Andersen: 12; Gorman: 6(c) and 10; and Hillman: 8(d) and 8(f).

13.     Having the protection of its exclusive distribution agreement with OSA, Interbrands, with OSA's knowledge and encouragement, purchased Shaw-Ross' remaining inventory of OSA products; posted prices with the relevant state agencies; secured, at its own expense, federal label approvals for products produced by OSA; and proceeded, also at its own expense, to market those products in the United States.  Andersen: 13; Exhibits 6-12.

14.     By the end of 1989, Interbrands had secured all required label approvals, had reintroduced the OSA products in the United States market in time for the holiday season and had commenced regular purchases of products produced by OSA for distribution into the United States. Andersen: 14.

15.     For the next twelve years, Interbrands Inc. (until 1994) and International Brands USA, Inc. (after September 1994) built a U.S. distribution network for products produced by OSA; aggressively promoted, at its expense, OSA products; reported to OSA product depletions and other confidential information of the type expected of an exclusive distributor; provided to OSA necessary information for the distribution of alcoholic beverage products in the U.S.; maintained more than adequate warehousing facilities and purchased on an ongoing basis sufficient volumes of OSA products to meet market demand.  Andersen: 15-16; Exhibits 13-16.

16.     Even when Interbrands ran into credit problems, and fell substantially behind in paying OSA for shipments, Robert Haswell continued to acknowledge that Interbrands was OSA's exclusive distributor and that there existed as between OSA and Interbrands an "exclusive agency agreement."  Andersen: 17; Exhibits 17 and 18.

17.    In 1994, Mr. Andersen decided to create a new company, International Brands USA, Inc. to carry on the business of Interbrands free of the burden of a poor credit rating.  Upon formation of the new company, Mr. Andersen caused Interbrands to assign its rights and obligations under the exclusive distributorship agreement to International Brands USA, Inc.  OSA was promptly informed of such assignment.  Andersen: 18; Exhibit 19.

18.    Following the assignment by Interbrands of its exclusive distribution rights to International Brands USA, Inc., OSA recognized and dealt with International Brands USA, Inc. (which, for simplicity, conducted business as "International Brands, Inc.") as its exclusive United States distributor.  International Brands USA, Inc., in turn, assumed full responsibility for continuing the development of the United States market for OSA products.  Andersen: 19.

**Facts Concerning the Introduction and Sale of Clubhouse**

19.    Prior to 1994, the Scotch whisky products produced by OSA for distribution in the United States, were bottled in a white golf ball-shaped bottled (50ml and 750ml size) displaying the name "Old St. Andrews."  International Brands' sales of that product averaged approximately 750 cases per year.  Andersen: 20.

20.    In 1994, at Rolf Andersen's urging, those products was revamped; a higher quality scotch whisky was selected for the products, the bottle was changed to a clear golf-ball shaped bottle and the packaging was upscaled.  Andersen: 21.

21.    To connote the "upscaling" of the product, Mr. Andersen proposed to Robert Haswell that the name "Clubhouse" be added to the bottle and packaging of the products being distributed in the United States.  OSA accepted that suggestion and, commencing in 1994, the product containing the higher quality scotch and bottled in clear bottles displayed both the names

"Old St. Andrews" and "Clubhouse."  Clubhouse became the dominant name of the product. Andersen: 22.

22.      In reliance upon its exclusive distributorship agreement with OSA, International Brands, at its own expense, secured all the required approvals for sale of the Clubhouse in the United States.  Andersen: 23.

23.      To boost sales of Clubhouse, International Brands, at its own expense, developed promotional materials and aggressively marketed Clubhouse through advertising, promotions and local dealer incentives.  Andersen:  24; Exhibit 20.

24.      OSA was informed of International Brands' promotional efforts and even requested to purchase some of International Brands' promotional materials for use in other markets.  Andersen: 25; Exhibits 21-25.

25.      As a result of International Brands' marketing efforts, its local distributors increased their orders of Clubhouse.  From 1994 through 1998 International Brands' own annual purchases of OSA products (primarily Clubhouse) from OSA grew from roughly 1700 cases in 1994 to over 10,000 cases in 1998 (a portion of which was delivered in 1999).  Indeed, International Brands' sales of OSA's products, primarily "Clubhouse," grew to the point where such sales accounted for more than 25% of International Brands' business.  Andersen: 26.

26.      In late 1988, Rolf Andersen and Robert Haswell agreed that the labeling, packaging and bottle for the 750ml Clubhouse product should again be restyled to create a newer, more attractive Clubhouse product.  OSA restyled the 750ml bottle.  International Brands then undertook, at its own expense, to restyle the packaging and launch a major promotional and advertising campaign in the United States for the Clubhouse product.  Andersen: 27.

27.     In connection with the restyling of the 750ml Clubhouse product, International Brands, at its own expense, and with the knowledge and encouragement of OSA, engaged a highly regarded marketing expert, Matt Klim, to redesign various aspects of the Clubhouse bottle label, gift box and shipping carton.  Andersen: 28; Exhibits 27-29; Klim: 4, 9, 10 and 14; Exhibits 62, 66, 67 and 71.

28.     International Brands, at its own expense, and with the knowledge and encouragement of OSA, also engaged Mr. Klim to create designs and layouts for product brochures and advertisements.  Andersen: 29; Klim: 4, 11-12, 21; Exhibits 68, 69 and 78.

29.     International Brands, at its own expense, and with the knowledge and encouragement of OSA, also engaged Mr. Klim to create promotional items such as pocket knives, golf shirts, golf gloves and tee shirts to generate interest in and sales of the product.  Andersen: 30; Klim: 4, 12 and 19; Exhibit 69.

30.     International Brands, at its own expense, and with the knowledge and encouragement of OSA, also engaged Mr. Klim to create point of sale materials such as banners, posters, floor stands, "shelf takers," "table tents," "Bar Cards," stir sticks, and other product displays.  Andersen: 31; Klim: 4, 15-20; Exhibits 69-77.

31.     Both Robert Haswell and Julian Haswell were advised by Mr. Andersen of Mr. Klim's activities with regard to the design, promotion and advertising of the Clubhouse product. Andersen: 32.

32.     Mr. Klim's billing to International Brands during the period 1999-2001 were $359,727.53, all of which were paid by International Brands.  Klim: 5; Exhibit 63.  Mr. Klim's

billings were based on customary rates in the design industry; Klim Designs' reputation and the nature of the projects executed.  Klim: 5.

33.     The promotional and point of sale materials were manufactured by various companies at International Brands' expense.  Andersen: 33.  Additionally, International Brands funded the cost of promotional events aimed at consumers, including a series of promotional events in Southern Florida.  Andersen: 34.  In total, International Brands spent $604,829.66 during the period 1999-2001 purchasing promotional products and financing promotional events for the new Clubhouse product.  Andersen: 33 and 34; Exhibits 30 and 30A.

34.     The new Clubhouse product was ready for full scale production in late 2000. Accordingly, beginning in December 2000, International Brands, at its own expense, and with the knowledge and encouragement of OSA, had Mr. Klim create a full page magazine advertisement which was then run in Golf Magazine, Senior Golfer and similar publications.  The magazine advertisements cost International Brands $523,397.30.  Andersen: 35-36; Exhibits 32-40; Klim: 4, 6-7, 23-24; Exhibits 64-65.

35.     Both Robert Haswell and Julian Haswell were informed of the efforts and substantial expense International Brands was incurring in designing, promoting and advertising the new Clubhouse product.  Andersen: 37.  Indeed, Klim Design communicated directly with Julian Haswell concerning a number of the design projects being performed.  Klim: 9, 10 and 14.  And Robert Haswell believed that International Brands was spending in the "million" in advertising. Roger Turner Deposition Transcript, pp. 72-73.

**CHANGE OF CONTROL AT OSA**

36.     In August 2000, Robert Haswell passed away. Roger Turner, who had been hired by Robert Haswell as a consultant, was appointed by the executors of the Robert Haswell estate as Chairman of OSA. Julian Haswell assumed the duties of "Managing Director." Andersen Aff: 38; Roger Turner Deposition, pp. 53-56.

37.     In early 2001, Julian Haswell proposed to Mr. Andersen a production schedule and pricing for the new 750ml Clubhouse product. Mr. Haswell's proposed pricing was 20 pounds sterling, per case, for the first 1,000 cases; 18 pounds sterling, per case, for the balance of 3,650 cases ("20/18 Price"). Andersen: 39.

38.     On January 26, 2001, International Brands submitted a formal purchase order for 4,650 cases of the new 750ml Clubhouse product at a price of 18 pounds sterling per case ("18 Price") for each of the 4,650 cases, the $2 per case savings being used to help defray International Brands advertising expense ("4,650 Case Order"). Andersen: 40; Exhibit 41.

39.     OSA accepted International Brands purchase order and on February 2, 2001 indicated that production was about to begin. Andersen: 41; Exhibit 42.

40.     On February 26, 2001, Julian Haswell requested that International Brands wire to OSA's bank 26,045 pounds sterling sterling to "help pay the cost of the bulk whisky I have purchased for your order of 4,650 cases which is now becoming due for payment" (hereinafter the "bulk whisky advance"). Andersen: 42; Exhibit 43.

41.     International Brands agreed to advance such funds which were to be credited against the cost of the 4,650 order. On March 9, 2001, International Brands wired to OSA's bank $40,549.01 (equating to 28,355 pounds sterling) representing the bulk whisky advance, receipt of which was acknowledged by OSA. Andersen: 43; Exhibit 44.

42.     The first 1,200 cases of the 4,650 Case Order were shipped in April 2001. International Brands applied the invoiced cost of that shipment (23,600 pounds) to the balance due from OSA for defective products and the bulk whisky advance.  Andersen: 44.

43.     On June 5, 2001, Julian Haswell requested payment for 783 additional cases of the 750ml Clubhouse which were purportedly ready for shipment.  Andersen: 45; Exhibit 45.

44.     By letter dated June 8, 2001, Rolf Andersen reminded Julian Haswell that International Brands had a credit balance in its favor of 55,302 pounds sterling for (i) defective goods (including goods that had been returned to OSA at OSA's request), and (ii) the bulk whisky advance.  That credit advance was sufficient to cover the cost of the 1,200 cases that had been shipped plus an additional 1,783 cases.  Andersen: 46; Exhibit 46.

45.     On June 22, 2001, International Brands requested that in addition to the 783 cases of 750ml Clubhouse that had purportedly been produced, OSA produce an additional 1,617 cases so that a 2,000 case container could be loaded and shipped.  Andersen: 47; Exhibit 47.

**Facts Pertaining to Julian Haswell's Termination of the Exclusive Distributorship Agreement**

46.     By fax dated June 25, 2001, Julian Haswell responded to Mr. Andersen's fax of June 22 and advised Mr. Andersen that OSA would not produce any more cases of 750ml Clubhouse until it received from International Brands payment for the 783 cases it was holding. Mr. Andersen insisted that OSA apply the credits due International Brands to the 4,650 Case Order.  Andersen: 48.

47.     Separately, during the summer of 2001, Roger Turner, acting on behalf of Robert Haswell's widow, Ann Haswell (Julian Haswell's stepmother), and Rolf Andersen engaged in

negotiations concerning the purchase by International Brands of the Estate's majority interest in OSA.  Andersen: 49; Roger Turner Deposition: pp. 85-89.

48.    According to Mr. Turner, Julian Haswell – who was aware of such negotiations – was annoyed that an "outside person" was attempting to purchase OSA which he felt was "rightly his."  Roger Turner Deposition: pp. 90-91.

49.    Julian Haswell regarded Mr. Andersen's discussions with his stepmother as "predatory."  Julian Haswell Deposition: pp. 418-425.

50.    The negotiations concerning International Brands' purchasing the Estate's interest in OSA did not reach fruition; Ann Haswell eventually sold the Estate's shares of OSA to Julian Haswell.  Andersen: 51.

51.    By letter dated October 1, 2001 to Mr. Haswell and Mr. Turner, Mr. Andersen sought to resolve the outstanding payment issues and secure delivery of the balance of the 4,650 Case Order.  Andersen: 52; Exhibit 49.

52.    Mr. Haswell did not respond to Mr. Andersen's October 1st letter but rather, on October 12, 2001, advised Mr. Andersen that he had successfully concluded the purchase of OSA from his father's estate.  Mr. Haswell's letter included a bill to International Brands for 15,035.70 pounds sterling.  None of the charges on that bill had been agreed to by International Brands or previously invoiced by OSA to International Brands.  OSA refused to ship the balance of the 4,650 Case Order unless International Brands paid such charges.  Andersen: 53; Exhibit 50.

53.    By letter dated November 16, 2001, Mr. Andersen objected to OSA's October 12th bill, and insisted that its credits be honored.  Mr. Andersen reiterated in that letter

International Brands' desire to take the balance of the 4,650 case order. Andersen: 54; Exhibit 51.

54.      By letter dated November 21, 2001, Julian Haswell advised Mr. Andersen that "with immediate effect, Old St. Andrews will no longer be supplying their products to International Brands, Inc. as a <u>customer</u>. . ." Andersen Aff. 55; Exhibit 52.

55.      The three grounds upon which OSA based the termination of International Brands were fictitious. Andersen: 55.

56.      The summary termination of International Brands as OSA's exclusive United States distributor, and OSA's refusal to continuing shipping Clubhouse products to International Brands did not comport with the recognized custom and practice prevalent in the United States distilled spirits industry with respect to the treatment of exclusive distributors. Andersen: 57; Gorman: 6(d) and 12; Hillman: 8(d) and 8(g); Roger Turner Deposition: p. 122.

57.      In an effort to avoid OSA's obligation to International Brands, Julian Haswell asserted in his termination letter that International Brands was merely a "customer". Julian Haswell knew that assertion was false. After issuing its August 2, 1989 appointment letter to International Brands, OSA sold its products to International Brands and no other United States domestic distributor; OSA acknowledged in writing that International Brands was its exclusive United States distributor; and OSA imposed upon International Brands requirements (such as reporting inventories) appropriate for an exclusive distributor, not a customer. Andersen: 16, 17 and 56. Julian Haswell Deposition Transcript: 59-60.

58.     Between 1999 and November 2001 International Brands spent the following amounts advertising and promoting Clubhouse prepatory to the roll-out of the new Clubhouse 750ml product:

| | |
|---|---|
| Expenses incurred by International Brands in purchasing promotion products and funding various promotional events for the Clubhouse product during 1999-2000 | $  604,829.66 |
| Expenses of Klim Design in creating the artwork for the new Clubhouse Gift Carton, creating the various magazine ads and creating the promotional and point of sale products used to market Old St. Andrews Clubhouse Scotch whisky | $  359,727.53 |
| Expenses of running full page ads in Golf Magazine, ATT Magazine, U.S. Open Magainze, Met Golfer and Beverage Media | $  523,397.70 |
| | $1,487,954.00 |

Andersen: 33 and 34; Exhibit 30 and 30A; Klim: 5 and 7; Exhibits 63 and 65.

59.     During the period 1999 – 2001, International Brands realized profits on sales during that period of only $154,412.89.  Witness:  Rolf Andersen.

60.     International Brands reliance damages amount to:

Development/Advertising/Promotional Expenses 1999 – 2001     $1,487,954.80
Profits 1999 – 2001                                         $ (154,412.89)
                                                             $1,333,542.00

**Facts Concerning Credits Due International Brands for Defective Goods**

61.     From time to time, OSA shipped to International Brands goods that were defective by reason of their bottling, packaging or labeling.  OSA would accept return of such goods and credit International Brands for their cost (purchase price plus costs of shipping).  Andersen: 61.

62.    In August 1999, Rolf Andersen advised Robert Haswell that the United States government inspectors had determined that the labels on the 50ml white golf ball shaped bottles of Old St. Andrews "Classic" ("50ml Classic") failed to conform to law as they did not designate the product as Scotch whisky.  Mr. Haswell agreed the defectively labeled product could be returned to OSA for credit.  Andersen: 62; Exhibit 53.

63.    International Brands secured BATF permission to liquidate its inventory of 50ml Classic until January 1, 2000, later extended to March 30, 2000.  Andersen: 63.

64.    In terms of the 50ml Classic already in the hands of wholesalers, the State of Virginia (which controls the sale of alcohol in that state) required that International Brands either recover the product from roughly 180 state liquor stores or issue a "depletion allowance" so that the state could accelerate the sale of the product.  Andersen: 64.

65.    After discussions between Rolf Andersen, Robert Haswell and Julian Haswell on this issue, Robert Haswell and Julian Haswell agreed that OSA would credit International Brands for the amount of any depletion allowance issued by International Brands to the State of Virginia. Accordingly, International Brands elected to have the 50ml Classic liquidated by the State of Virginia rather than recover the product from 180 state liquor stores and returning same to OSA for full credit.  Andersen: 65.

66.    In April 2000, OSA requested that International Brands make arrangements for the return of International Brands' stock of mislabeled 50ml Classic, amounting to 212 cases.  Andersen: 66; Exhibit 54.

67.    In June 2000, International Brands advised OSA that it would be returning 212 cases of mislabeled Classic.  Andersen: 67; Exhibit 55.

68.    In June 2000, OSA approved the shipping costs that had been quoted to International Brands and accepted the return of the 212 cases.  Andersen: 68; Exhibit 56.

69.    On July 15, 2000, International Brands issued to OSA the following credit invoices:

Inv. 715 - $28,857.00          Reimbursement for the cost of 212 cases of ml
                               classic returned to OSA.

Inv. 716 - $ 9,046.64          Reimbursement for cases of 50ml Classic sold
                               pursuant to a depletion allowance permitted by the
                               State of Virginia or returned from Virginia
           $37,903.64          distributors.

Andersen: 69; Exhibits 57 and 58.

70.    Despite demand, OSA has failed and refused to pay Invoices 715 and 716.

Andersen: 70.

## Summary of International Brands' Claim

71.    International Brands has established a sufficient factual basis for the following claims:

| | |
|---|---|
| Damages for Breach of the Exclusive Distributorship Agreement | $1,333,542.00 |
| Unreimbursed bulk whisky advance less price of 750ml Clubhouse delivered by OSA in 2001 | 6,801.01 |
| Outstanding Invoices 715 and 716 | 37,903.64 |
| | $1,378,246.65 |

–18–

### III.  PROPOSED CONCLUSIONS OF LAW

### COUNT ONE - OSA BREACHED THE PARTIES DISTRIBUTORSHIP AGREEMENT

1.      The August 2, 1989 appointment letter executed by Robert Haswell on behalf of OSA and issued to International Brands served to memorialize an exclusive distributorship agreement between OSA, as a product supplier, and International Brands, as a product distributor.  See Bert G. Gianelli Distributing Co. v. Beck & Co., 171 Cal. App. 3d 1020 (Cal. Ct. App. 1985) ("very brief" one paragraph letter issued by beer manufacturer to beer distributors authorizing sale of manufacturer's products, constituted distribution agreement between beer manufacturer and local distributors); Des Moines Blue Ribbon Distributors, Inc. v. Drewrys Limited, USA, Inc., 129 N.W.2d 731, 733-735 (Iowa 1964) (manufacturer's letter to plaintiff referring to plaintiff as defendant's distributor in a designated territory memorialized exclusive distributorship agreement).

2.      The parties' exclusive distributorship was based on mutual obligations and actual performance.  OSA obligated itself to sell its products in the United States domestic market exclusively through International Brands.  International Brands, in turn, was obligated to develop a market for such products, maintain an adequate distribution network and warehousing facilities for such products and purchase from OSA an adequate amount of such products to meet the demand of the market.  Furthermore, both parties acknowledge through their actions their respective obligations to each other.  After August 2, 1989, OSA sold its products to International Brands and to no other domestic distributor in the United States.  For its part, International Brands, at its own expense, secured the necessary label approvals for OSA products; built a distribution network for such products, advertised and promoted such products

and purchased a sufficient volume of the products to meet market demand.  Additionally, OSA

requested, and International Brands regularly provided, depletion reports and other confidential

information typically provided by an exclusive distributor.  Accordingly, the exclusive

distributorship agreement between the parties was supported by adequate consideration;

International Brands could not be regarded as merely a customer with whom OSA could cease

conducting business at will.  J. C. Millett Co. v. Park & Tilford Distillers Corp., 123 F. Supp.

484, 489-490 (N.D. Cal. 1954) (rejecting liquor distiller's argument that distributor merely

exercised the privilege of distributing the distiller's products and holding that distributor's

promise to use its best efforts to promote the sale of distiller's product is sufficient consideration

for an enforceable distributorship agreement.  Des Moines Blue Ribbon Distrbutors, supra, at

906-907 (finding that distributor's advertisement and promotion of manufacturers products

furnished sufficient consideration for an exclusive distributorship agreement).  See also U.C.C.

§ 2-208 (recognizing parties' course of performance as relevant to determine meaning of their

agreement).[2]

      3.     Furthermore, even if there had been no express exclusive distribution agreement

between OSA and International Brands, their course of conduct as described above would have

given rise to an implied distribution agreement.  See Varni Brothers Corporation v. Wine World,

Inc., 35 Cal. App. 4 880 (Cal. Ct. App. 1995) (1995) (wine distributors' development of a market

for wine producers products and distribution of those products over a course of years created

implied contracts, the terms of which must necessarily be determined by their course of conduct

---

[2]   Connecticut has adopted the Uniform Commercial Code which is codified at Title 42a of the Connecticut General Statutes.

and usage of the trade); <u>California Wine Association v. Wisconsin Liquor Co. of Oshkosh</u>, 121

N.W.2d 308 (Wis. 1963), (finding implied exclusive brandy distributorship contract based on

distributor's promotion of the product, suppliers exclusive sales to distributors and performance

of other functions typical of an exclusive distributor).

4.      The parties' intent that their exclusive distributorship agreement be perpetual in

duration is demonstrated by the absence in the August 2, 1989 appointment letter of any

expiration date or reservation of the right to terminate.  <u>See</u> 17 Am. Jur. 2d, Contracts § 486

("the intention of parties to an agreement that it should be perpetual and without limit could not

be more properly expressed than by silence as to any time limit or power of reservations").  <u>See</u>

<u>also</u> <u>Burkle v. Superflow Manufacturing Co.</u>, 137 Conn. 488, 495-496, 78 A.2d 698, 702-3

(1951) (recognizing an oral contract between manufacturer and manufacturing broker for the sale

of plumbing items, which had no time limitation, to be "permanent and perpetual in the

obligation it imposes").

5.      As a perpetual contract, the parties' exclusive distributorship agreement could not

be unilaterally terminated by OSA, at least not without cause.  <u>Burkle</u>, at 496.  <u>See also</u> <u>Joe</u>

<u>Regueira, Inc. v. American Distilling Company, Inc.</u>, 642 F.2d 826, 830 (5th Cir. 1981) (finding

exclusive distributorship agreement for alcoholic beverages to be a "perpetual contract" that was

not terminable at the will of the manufacturers) <u>Burgermeister Brewing Corporation v. Bowman</u>,

227 Cal. App. 2d 274, 277 (Cal. Ct. App. 1964) (oral contract creating a beer distributorship for

so long as distribution used his best efforts to promote sales and "took care of his territory" held

not to be terminable at will of supplier).

6.      The foregoing construction of the exclusive distributorship agreement is consistent with industry custom and usage, which the court may consider where, as here industry custom does not contradict or vary a specific term of the agreement.  New England Rock Services, Inc. v. Empire Paving, Inc., 53 Conn. App. 771, 780-1, 731 A.2d 784, 789 (1999) (applying industry custom to as certain nature and extent of parties' agreement); J.C. Millett Co., supra, at 489-490 ("the understanding in the trade as to what a distributorship encompasses, its economic function and business purpose, and the latter actions of the parties in pursuing this relation before any disagreement arose are all entitled to great weight in determining their respective undertakings.").  See also, Restatement (Second) of Contracts, § 227.

7.      Plaintiff has established that at the time the parties' agreement was made, prevailing custom and practice in the distilled spirits industry was that an exclusive distributorship agreement for Scotch whisky could be terminated by the supplier, without compensation, only for good cause, meaning willful misconduct, false reporting of sales, loss of importer's license on unjustified failure to purchase product.

8.      Plaintiff also established that, at the time the parties' agreement was made, industry custom and practice, required that, in the event of termination without cause, a distributor who invested its own money developing a market for a supplier's products be compensated in an amount sufficient to recover its unamortized investment in the product and/or lost profits.  That custom and purchase practice was entirely consistent with common law principles.  See Allied Equipment Company v. Weber Engineered Products, Inc., 237 F.2d 879, 882 (4 Cir. 1956) (holding that a distributor who expands its own funds to develop a distribution system for a manufacturer's products, and is improperly terminated, is entitled to damages in an

amount of its unrecovered expenditures made with knowledge of the manufacturer and in reliance on its relationship with manufacture).

9. Plaintiff also established that the industry custom and practice in 2001 was to honor the terms of the "informal" agreements that were created prior to the adoption of more complex distribution agreements. Thus in 2001, International Brands was entitled to the protections that attached, as a matter of custom and practice, to the exclusive distribution agreement when it was made in 1989 Cf. Varni Brothers Corp. v. Wine World Inc., 35 Cal. App. 4 880, 893 (Cal. Ct. App. 1995) (where original trade usage was found to be no longer applicable).

10. No good cause has been established for terminating International Brands' exclusive distributorship and OSA's summary termination of International Brands distributorship on November 21, 2001 – after more than twelve years of functioning as OSA's exclusive United States distributor – constituted a breach of contract. OSA is therefore liable for damages arising from its breach.

11. In general, contract law exposes three distinct, yet equally important, theories of damages to remedy a breach of contract: expectation damages, reliance damages, and restitution damages. Atacs Corp. v. Trans World Communications, Inc., 155 F. 3d 659, 669 (3 Cir. 1989). "[W]here a court cannot measure lost profits with certainty, contract law protects an injured party's reliance interest. . . usually through the recovery of expenditures actually made in performance or in anticipation of performance." Id. At 669.

12. Here, plaintiff seeks to recover the amounts it spent during the period 1999 – 2001 in connection with the performance of its obligations as OSA's exclusive United States

distributor.  Such amounts are properly recoverable by International Brands as its reliance

damages.  C.C. Hauff Hardware, Inc. v. Long Mfg. Co., 148 N.W. 2d 425 (Iowa 1967)

(affirming award of promotional expenses (among other things) associated with sale of

machinery manufactured by defendant where defendant terminated distributorship agreement

without cause or reasonable notice.  See also, Restatement (Second) of Contracts § 349 ("As an

alternative to [expectation damages], the injured party has a right to damages based on his

reliance interest, including expenditures made . . . in performance [of the contract].") and J.E.

Macy Annotation, Right to Recover, In Action for Breach of Contract Expenditures Incurred in

Preparation for Performance, 17 A.L.R.2d 1300 § 12 (Supp. 2000) ("As a general rule, where a

buyer seeks damages from a seller for failure to supply him with proprietary articles of which the

seller has granted him exclusive selling rights in his territory, he may recover his expenditures in

advertising the product and preparing to handle it").

   13. International Brands has established by a preponderance of the evidence that, with

knowledge of OSA, it incurred expenses totaling $1,487,954.80 in reliance upon its status as

OSA's exclusive United States distributor during 1999 – 2001.

   14. International Brands has properly deducted from its expenses the profits it

realized during that same time period.

   15. International Brands is therefore entitled to judgment on its first count in the

amount of $1,333,542.

**COUNT TWO - OSA VIOLATED THE IMPLIED OBLIGATION
OF GOOD FAITH AND FAIR DEALING**

   16. Every contract imposes upon each party a duty of good faith and fair dealing in its

– 24 –

performance and its enforcement.  Warner v. Konover, 210 Conn. 150, 154 553 A.2d 1138,1140 (1989), Conn. Gen. Stat. § 42a-205.

17.    The findings of fact above, if they did not constitute a breach of the express terms of the parties exclusive distributorship agreement, would certainly compel the conclusion that OSA violated its duty of good faith and fair dealing in connection with its abrupt termination of the agreement.

18.    OSA was aware in November 2001 that International Brands was in the midst of very active and expensive efforts to promote and advertise the new Clubhouse product after having just redesigned the packaging and labeling for the product.  OSA knew that those efforts were being funded entirely by International Brands.  OSA's summary termination of International Brands distributorship, which effectively denied International brands the opportunity to recoup its investment, violated OSA's obligation of good faith and fair dealing.

19.    Furthermore, the fact that neither International Brands' industry experts nor OSA's own chairman expert were aware of any prior situation where a manufacturer of distilled spirits terminated a distribution without notice demonstrates that OSA violated "community standards of decency, fairness and reasonableness."  Warner v. Konover, supra, at 155 (citing 2 Restatement (Second), Contracts (1981) § 205.)  Thus constituting a violation of the implied obligation of good faith and fair dealing.

20.    The principles governing damages for beach of contract apply to OSA's violation of the covenant of good faith and fair dealing.

## COUNT SIX - INTERNATIONAL BRANDS IS ENTITLED
## TO RECOVER DAMAGES FOR DEFECTIVE GOODS

21.    The parties' course of dealings was that OSA would accept the return of goods that were defective because of their bottling, packaging or labeling -- a course of dealing entirely consist with the parties rights and obligations under U.C.C. §§ 2-601, 2-607 and 2-608.

22.    With respect to the mislabeled 50ml balls of Classic, International Brands complied with its obligations under U.C.C. § 2-603 by (i) complying with OSA's instructions concerning shipment of the mislabeled Classic still in International Brands possession and (ii) authorizing (with OSA's permission) the discounted sale of those bottles of 50ml Classic that were in the hands of the State of Virginia liquor stores.

23.    International Brands is therefore entitled to recover the "case cost" of the goods returned to OSA as reflected in invoice 715.  See U.C.C. § 2-711.  International Brands is also entitled to recover the "depletion allowances" charged by the State of Virginia Department of Alcoholic Beverage Control, and paid by International Brands, to liquidate its inventory of mislabeled Classic as reflected in Invoice 716.  See U.C.C. § 2-715.

24.    International Brands is therefore entitled to recover $37,903.64 for defective goods.

## COUNT SEVEN - INTERNATIONAL BRANDS IS ENTITLED
## TO REIMBURSEMENT FOR THE BULK WHISKY ADVANCE

25.    The documentation submitted by International Brands demonstrates that it advanced to OSA, at OSA's request, $40,549.01 to pay part of OSA's cost of bulk whisky to fulfill International Brands' 4,650 Case Order.

26.    The bulk whisky advance was to be credited against the cost of the 4,650 Case

Order.  However, only 1,200 cases of the 4,650 Case Order were shipped, leaving $6,801 due and owing from OSA to International Brands on account of the bulk whisky advance.  <u>See</u> Exhibit 49.

      27.    International Brands is entitled to judgment for $6,801 -- the amount necessary to put it in as good a position as it would have been if OSA had abided by the contract.  <u>See</u> <u>Western Geophysical Co. of America, Inc. v. Bolt Associates, Inc.</u>, 584 F.2d 1164 (2d Cir. 1978).

**COUNT EIGHT - OSA'S BREACH OF ITS CONTRACTUAL OBLIGATIONS AND DUTY OF GOOD FAITH AND FAIR DEALING TO INTERNATIONAL BRANDS CONSTITUTES A VIOLATION OF <u>CONNECTICUT UNFAIR TRADE PRACTICES ACT</u>**

      28.    In Count Eight, International Brands alleges that OSA is liable to it for damages for breach of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes §42-110 <u>et</u>. <u>seq</u>., hereinafter referred to as CUTPA.  Whether a practice violates CUTPA is determined within the context of circumstances which are uniquely available to the trial court.  *Thames River Recycling, Inc. v. Gallo, 50 Conn. App. 767, 794 (1998).*  Wrongful termination of distributor's agreement may provide basis for finding of CUTPA violation.  *Hartford Electric Supply co. v. Allen-Bradley Co., Inc. 250 Conn. 334, 367-370 (1999).*  In this case, the conduct of OSA summarily terminating its exclusive distributorship agreement with International Brands without cause and refusing to compensate it for product promotion, point of sale materials, promotional events and creative services related to product promotion; and its further refusal to credit International Brands for defective goods or to reimburse it for a bulk whisky advance and outstanding invoices is a violation of CUTPA.

29.     In *Boulevard Associates v. Sovereign Hotels, 72 F.3d 1029, 1038 (2nd Cir. 1995)*,

the Court of Appeals of the Second Circuit set forth the proper analysis for violation of CUTPA:

> "The central prohibition of CUTPA is contained in §42-110b
> which provides that [n]o person shall engage in unfair methods of
> competition and unfair or deceptive acts or practices in the conduct
> of any trade or commerce.  [I]n determining whether a practice
> violates CUTPA the Connecticut Supreme Court has adopted the
> criteria set out in the so-called cigarette rule developed by the
> Federal Trade Commission . . . According to the cigarette rule, a
> court must consider:  (1)[W]hether the practice, without
> necessarily having been previously considered unlawful, offends
> public policy as it has been established by statutes, the common
> law, or otherwise--whether, in other words, it is within at least the
> penumbra of some common law, statutory, or other established
> concept of unfairness; (2) whether it is immoral, unethical,
> oppressive, or unscrupulous; (3) whether it causes *substantial
> injury* to consumers".

30.     "A practice may be unfair because of the degree to which it meets one of the

criteria or because to a lesser extent it meets all three . . . Moreover, [our Supreme Court] has set

forth a three part test for satisfying the substantial injury criterion:  [1] [the injury] must be

substantial;  [2] it must not be outweighed by any countervailing benefits to consumers or

competition that the practice produces; and [3] it must be an injury that consumers themselves

could not reasonably have avoided."  (Internal quotation marks omitted.)  *Calandro v. Allstate

Ins. Co., 63 Conn. App. 602, 608, (2001)*.

31.     Applying the above criteria to the facts in this case, the context of OSA's

termination of its contractual relationship not only violates established common law principles of

contract law, coupled with its refusal to reimburse International Brands for over 1.3 million

dollars in expenses for expenditures made by International Brands on behalf of OSA, said

termination is conduct which is "immoral, unscrupulous, oppressive or unethical" as stated in the

second CUTPA criteria.  Further, OSA's unwarranted refusal to credit International Brands for the bulk whisky advance and outstanding invoices violates both of the aforesaid CUTPA criteria as well.  Finally, OSA's deliberate actions described herein have caused substantial damage to International Brands under the third statutory criteria of CUTPA.  OSA's conduct satisfies the substantial injury criterion used to determine whether a practice violates CUTPA entitling International Brands to restitution damages under CUTPA.  *Bailey Employment System, Inc. v. Hahn, 545 F.Supp. 62, 73 (D. Conn. 1982).*

32.    As established by the sworn statements of industry experts Harold Gorman and Andrew Hillman, distilled spirits industry standards provided that contracts like the one in question are perpetual in duration. As a result, a manufacturer's right to terminate a distributorship agreement such as the subject agreement is conditioned, at a minimum, upon reimbursement of expenditures made to promote and sell its products.  *Id.*

33.    For a breach of contract action to serve also as a CUTPA violation, a party must show substantial aggravating circumstances surrounding the breach.  *Boulevard Associates v. Sovereign Hotels, supra, 1038.*    The evidence submitted by International Brands meets this standard.  The facts which preceded OSA's termination indicated that OSA acted willfully, with knowledge that it owed International Brands for credits which it had wrongfully refused to acknowledge and that International Brands had expended large sums of money in its efforts to reposition, promote and market OSA's product. Knowing that industry standards required compensation of a distributor's unamortized investment and anticipated lost profits, OSA effectively terminated the agreement by its refusal to produce its product for International Brands' use as of June 25, 2001.  Thereafter, OSA ignored Mr. Andersen's attempts to resolve

outstanding credit and invoice issues, refused to ship any more of its product and summarily

terminated its distributorship agreement with International Brands by letter dated November 21,

2001.

34.    This is further evidenced by the fact that in 1989 prior to entering into the

exclusive distributorship agreement, Mr. Andersen stipulated that he would not take on the

distributorship without an assurance of continuity.  OSA's agreement to this predicate constitutes

an inducement upon which International Brands were entitled to and did rely throughout the

twelve year history of the distributorship. In the context of this longstanding business

relationship and the above established industry standards, OSA's conduct in 2001 prior to its

summary termination of the distributorship agreement by demanding advance preproduction

payments and refusing to credit International Brands for said payments or defective goods was

contrary to basic principles of contract law and principles of good faith and fair dealing.  OSA's

summary termination of the exclusive distributor agreement while refusing to acknowledge its

significant financial obligations to International Brands is further proof of its bad faith, and

constitutes conduct which is "immoral, unscrupulous, oppressive or unethical" under CUTPA.

*See* Conn. Gen. Stat. 42-110b.  OSA's termination of the agreement in response to International

Brands' insistence on credit for defective goods and monies previously advanced on orders, its

conduct related to International Brands' marketing and promotions of OSA's products further

constitutes exactly the type of unfair trade practices that are punishable under CUTPA.

35.    The parties agreed in 1998 that International Brands would undertake the task of

"upscaling" the Clubhouse product, improving its image and substantially expanding the product

market.  To be successful, this required significant expenditures of time and money by

International Brands, including fees for creating advertising, marketing and product redesign by

Matt Klim with input from Rolf Andersen.  All these expenses were incurred for the benefit of

OSA to create a more lucrative market for its products similar to the facts in *J.C. Millett Co. v.*

*Park & Tilford Distillers Corp., supra.*

> The further development of a market for [Park & Tilford] products
> was of the essence of the agreement.  Not only was this the
> economic sine qua non of the distributorship relation but it was so
> understood in the trade.  The acts of the parties were designed to
> further it.  The depletion reports and discussions between the
> parties about them. . .were directed toward this end. *Id*. at 490.

Similarly, OSA was aware of the entire scope of product development and marketing

expenditures International Brands was incurring to redesign and reposition its product in the

market.  It is undisputed that both sides recognized the need to redesign and reposition OSA's

product, and that OSA Chairman Roger Turner acknowledged that OSA management was aware

of the marketing design and advertising expenses International Brands was incurring for this

purpose and further that Robert Haswell discussed this with Mr. Andersen.

     36.     The very functions which International Brands carried out in furtherance of its

contractual relationship to OSA, gave rise to a further duty of good faith which OSA also

breached.  Agreements such as the subject exclusive distributorship agreement between the

parties have also been held to contain an implied covenant of good faith.  Breach of this duty of

good faith in addition to breach of contract is a well established foundation for finding a

violation of CUTPA.  *See Kelly-Springfield Tire Co. v. Bobo, 4 F.2d 71 (9th Cir. 1925); J.C.*

*Millett Co. v. Park & Tilford Distillers Corp., 123 F. Supp. 484 (D.C. Cal 1954); Jack's Cookie*

*Co. v. Brooks, 227 F.2d 935 (4th Cir. 1955); Hunt Foods v. Phillips, 248 F.2d 935 (9th Cir.*

*1957).*

37.     CUTPA claims may include a broader range of conduct than common law actions. *L.G. DeFelice, Inc. v. Fireman's Insurance Co., 41 F.Supp. 2d 152, 166 (D. Conn. 1998).*

Factors considered by courts conducting such analysis include the duration of the distributorship relationship and the extent of the efforts and expenditures undertaken by the parties. In particular, OSA's conduct in 2001 reflects a deliberate pattern of oppressive actions calculated to cause the very damage that International Brands has suffered. In February 2001, OSA demanded that International Brands advance 26,045 pounds sterling to secure a bulk whisky purchase to fill its order of 4,650 cases of Clubhouse Whisky. Both OSA's insistence on an advance payment for 783 cases of product refusing to credit International Brands for either the advance payment it had made in February or the defective products which International Brands had returned to it and refusal to fill an order from International Brands unless it received the above advance payment were oppressive and unscrupulous conduct. OSA exacerbated this wrongful conduct further when it then refused to ship a 4,650 case order unless International Brands paid unauthorized charges of 15,035.70 pounds sterling. Such unreasonable preemptory demands coupled with OSA's refusal to respond to Mr. Andersen's request to discuss these matters requires a finding that OSA intentionally violated CUTPA. Such conduct constitutes intentional reckless indifference to International Brands' rights required for a finding of CUTPA a violation.

38.     OSA knew that much more than outstanding orders were at stake when it chose to terminate the agreement. Applying these well established principles of distributorship relationships in the distilled spirits industry to the facts of this case, OSA's conduct is actionable

under any of the statutory criteria of CUTPA.  The above wrongful conduct of OSA falls squarely within the category of cases where Connecticut courts have upheld the public policy of Connecticut to promote fairness among businesses. *Chem-Tek, Inc. v. General Motors Corp.,* 816 F.Supp. 123 (D. Conn. 1993); *Hartford Electric Supply Company v. Allen-Bradley Company, Inc., et al,* 250 Conn. 334 (1999*) (franchise law);  Tillquist v. Ford Motor Credit Co., 714 F.Supp. 607, 616 (D. Conn. 1989) (banking regulations).*

39.     Connecticut General Statutes § 42-110(g) provides that the court may award in its discretion punitive damages in addition to compensatory damages as damages to plaintiffs in actions brought under CUTPA.  *L.G. DeFelice, Inc. v. Fireman's Insurance Co., supra at 167; United Technologies Corp. v. American Home Assurance Company, 118 F.Supp. 2d 164, 178-179 (D. Conn. 2000).*

40.     The standard for an award of punitive damages under CUTPA is a finding of reckless, i.e., willful or wanton, indifference to the rights of others.  *United Technologies Corp. v. American Home Assurance Co., supra at 167; L.G. DeFelice, Inc. v. Fireman's Insurance Company, supra.*  The evidence presented by International Brands in this case meets the legal test for an award of punitive damages.

41.     While CUTPA does not provide a method for determining punitive damages, courts generally award punitive damages in amounts equal to actual damages or multiples of the actual damages.  Determining the punitive damages award under CUTPA by doubling the compensatory damages has been upheld as an accepted standard for an award of punitive damages.  *Advanced Financial Services, Inc. v. Associated Appraisal Services, Inc., 79 Conn. App. 22, 33 (2003), citing Bailey Employment System, Inc. v. Hahn, 545 F.Supp. 62, 73 (D.*

*Conn. 1982) aff'd, 723 F.2d 895 (2d Cir. 1983).*

42.    Section 42-110(g) of CUTPA also provides for an award of attorneys' fees as an element of damages.  When awarding attorney's fees under CUTPA, the court must consider the following twelve factors:  "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." (Internal quotation marks omitted.)  *Jacques All Trades Corp. v. Brown, 57 Conn. App. 189, 198 (2000).*

43.    The affidavit of Attorney Marc J. Kurzman dated May 11, 2004 sets forth the legal fees which International Brands has incurred in the prosecution of this action since its inception in February, 2002 in the amount of $290,208.42.

## <u>OSA'S COUNTERCLAIMS SHOULD BE DISMISSED</u>

OSA has failed to appear and prosecute their counterclaims. Therefore, for the reasons stated in International Brands' Motion for Summary Judgment and Proposed Conclusions of Law, plaintiffs are entitled to dismissal of said counterclaims by the Court with prejudice.

THE PLAINTIFFS,

INTERNATIONAL BRANDS USA, INC.
AND INTERBRANDS, INC.


By /s/ Mary E. Sommer
    Marc J. Kurzman ct01545
    Mary E. Sommer ct04345
    SANDAK HENNESSEY & GRECO LLP
    970 Summer Street
    Stamford, CT  06905
    Telephone: (203) 425-4200
    Facsimile: (203) 325-8608