UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------------x
:
INTERNATIONAL BRANDS USA, Inc. and : 
INTERBRANDS, INC. :
:
    Plaintiffs, : CIVIL ACTION NO.:
:
v. : 3:02 CV 00333 (MRK)
:
OLD ST. ANDREWS LIMITED :
:
    Defendant. : MAY 8, 2004
:
---------------------------------------------------------------------x

## AFFIDAVIT OF ROLF ANDERSEN

Rolf Andersen, being duly sworn, deposes and says:

1. I am over the age of 18 years and understand the obligations of an oath.

2. I am the President of plaintiffs International Brands USA, Inc. and Interbrands, Inc. I was personally involved in all aspects of the plaintiffs' business relationship with defendant Old St. Andrews Limited ("OSA"). I am also personally familiar with the nature of OSA's business. I therefore have personal knowledge of all the facts set forth herein.

**Facts Concerning the Creation of the Parties' Exclusive Distributorship Relationship**

3. International Brands USA, Inc. and Interbrands, Inc. (hereinafter referred to collectively as "International Brands"), were at all relevant times Delaware corporations operating out of Farmington, Connecticut and engaged in the importation and distribution of alcoholic beverages in the United States.

4. OSA was founded in the early 1970s and produced, through third party distillers and bottlers, alcoholic beverages, including Scotch whisky products bearing the name "Old St. Andrews," for distribution throughout the world.

5. OSA's products were originally distributed in the United States by Shaw-Ross International Importers, Inc. ("Shaw-Ross"), a company formerly located in Miami, Florida. I am aware through conversations with OSA's former Chairman and majority shareholder, Robert Haswell, and representatives of Shaw-Ross, that OSA and Shaw-Ross mutually terminated their exclusive distributorship relationship in or about 1988.

6. In or about May 1989, Robert Haswell and I began discussions concerning Interbrands' "exclusive distribution" of OSA's products in the United States (and other territories). Annexed hereto as Exhibits 1 and 2 are copies of the initial communications between me, Stewart Shepley (an OSA representative) and Robert Haswell concerning Interbrands acting as OSA's exclusive distributor in the United States (and other territories).

7. One of the issues Robert Haswell and I discussed was Interbrands' purchase of Shaw-Ross' remaining inventory of OSA products. I advised Mr. Haswell that Interbrands would make such a purchase if, and only if, Interbrands and OSA "[had] some form of agreement." Mr. Haswell, in turn, acknowledged in writing his understanding that Interbrands would "only take over" any Shaw-Ross inventory of OSA products "subject to our final agreement being made." Copies of telex exchanges between Robert Haswell and me concerning this issue are annexed as Exhibits 3 and 4.

8. In August 1989, Robert Haswell and I reached agreement on the terms of our companies' relationship. Interbrands would be appointed OSA's exclusive United States distributor.

As exclusive distributor, Interbrands would be responsible for developing a market in the United States for products manufactured by OSA. To this end, Interbrands would be required to maintain an adequate distribution network and warehousing facilities and to purchase an adequate amount of such products to meet the demand of the market. OSA, in turn, would sell its products to no other United States distributor (with the exception of "duty free" shops) and would extend to Interbrands discounts off its published price lists.

9. The agreement I reached with Robert Haswell was to be perpetual in duration; so long as Interbrands met its obligations to OSA in terms of developing a market for products produced by OSA and purchasing a sufficient volume of such products to meet market demand, the parties' exclusive distributorship agreement would remain in effect.

10. Our companies' exclusive distributorship agreement was memorialized in a letter of appointment dated August 2, 1989 and executed by Robert Haswell. That letter, similar in form to the letters of appointment issued to International Brands by other manufacturers for whom it acted as exclusive distributor, formally appointed Interbrands as OSA's "exclusive agent for distributing OSA's products in the entire United States" and was required to be filed in certain states (so-called "control states") in order for International Brands to distribute Old St. Andrews' products there. A copy of the August 2, 1989 appointment letter is annexed as Exhibit 5.

11. As of August 1989, I had been involved in the alcoholic beverage industry for roughly 26 years, having worked for various distillers from 1963-1971, having served as a Vice President for Heublein, Inc. (one of the world's largest distributors alcoholic beverages) from 1971-1980, having served as Eastern Regional Manager for Gallo Wine Company from 1980-1985 and having served as a consultant for various alcoholic beverage companies after 1985. As such, I was

well familiar with prevailing industry custom and practices with respect to the appointment of exclusive distributors.  I was aware that the appointment letter issued to Interbrands by OSA was a typical way to memorialize an exclusive distributorship relationship.  Furthermore, I was aware that, absent contrary agreement, an exclusive distributor could be terminated by its manufacturer/supplier without compensation only for good cause, such as willful misconduct, loss of importer's permit or unjustified failure to purchase the manufacturer's/supplier's products.

12.     Furthermore, under prevailing industry custom and practice, if an exclusive distributor invested its own funds developing a market for a manufacture/supplier's products, and its distributorship rights were terminated by the manufacturer/supplier without cause and prior to recovery of such investment, it was expected that the manufacturer/supplier compensate the distributor for its investment.

13.     Having the protection of an exclusive distribution agreement with OSA, Interbrands, with OSA's knowledge and encouragement, purchased Shaw-Ross' remaining inventory of OSA products; posted prices with relevant state agencies; secured, at its own expense, federal label approvals for products produced by OSA; and proceeded, also at its own expense, to market those products in the United States.  Annexed as Exhibits 6-12 are copies of letters and faxes I sent to Robert Haswell in August, September and October 1989 documenting Interbrands' activities after securing its appointment as OSA's exclusive United States distributor.

14.     By the end of 1989, Interbrands had secured all required label approvals, had reintroduced the OSA products in the United States market in time for the holiday season and had commenced regular purchases of products produced by OSA for distribution into the United States.

15. For the next twelve years, Interbrands, Inc. (until September 1994) and International Brands USA, Inc. (after September 1994) built a U.S. distribution network for products produced by OSA, aggressively promoted, at its own expense, OSA products; provided to OSA all necessary information to comply with United States regulatory requirements and purchased, on an ongoing basis, a sufficient volume of Old St. Andrews products to meet market demand.

16. Furthermore, International Brands regularly reported to OSA its inventory levels, the identity of its local distributors and its marking/promotional strategies – confidential information that it would not have provided to a supplier were it not serving as the exclusive distributor of that supplier's products. Attached as Exhibits 13, 14, 15 and 16 are the copies of the types of reports and information requests we regularly provided to (and received from) OSA.

17. Attached as Exhibits 17 and 18 are copies of letters I received from Robert Haswell in 1991. As those letters reflect, even when Interbrands ran into credit problems, and fell substantially behind in paying OSA for shipments, Robert Haswell continued to acknowledge that Interbrands was OSA's exclusive United States distributor and that there existed as between OSA and Interbrands an "exclusive agency agreement." The credit problems were eventually resolved and OSA never took any steps, prior to November 2001, to terminate International Brands' exclusive distributorship.

18. In 1994, I decided to create International Brands USA, Inc. to carry on the business of Interbrands free of the burden of a poor credit rating. Upon formation of the new company, I caused Interbrands to assign its rights and obligations under the exclusive distributorship agreement to International Brands USA, Inc. Attached as Exhibit 19 is a copy of the letter I prepared in

September 1994 formally assigning Interbrands' rights under the August 2, 1989 Appointment Letter to International Brands USA Inc. OSA was promptly informed of such assignment.

19.  Following the assignment by Interbrands of its exclusive distribution rights to International Brands USA, Inc., OSA recognized and dealt with International Brands USA, Inc. (which, for the sake of simplicity, conducted business as "International Brands, Inc.") as its exclusive United States distributor. International Brands, USA, Inc. in turn, assumed full responsibility for continuing the development of the United States market for OSA products.

**Facts Concerning the Introduction and Sale of Clubhouse**

20.  Prior to 1994, the Scotch whisky products produced by OSA for distribution in the United States, were bottled in white painted golf ball-shaped bottles (50ml and 750ml size) and barrels displaying the name "Old St. Andrews." International Brands' purchase of those products averaged approximately 750 cases per year.

21.  In 1994, at my urging, those products was revamped; a higher quality scotch whisky was selected for the products, the bottle was changed to a clear golf-ball shaped bottle and the packaging was upscaled.

22.  To connote the "upscaling" of the product, I proposed to Robert Haswell that the name "Clubhouse" be added to the products being distributed in the United States. OSA accepted that suggestion and, commencing in 1994, the product containing the higher quality scotch and bottled in clear golf ball-shaped bottles that were sold for distribution into the United States displayed both the names "Old St. Andrews" and "Clubhouse." "Clubhouse" became the dominant name of the product.

23. The new "Clubhouse" product required new federal label approvals. In reliance upon its exclusive distributorship agreement with OSA, International Brands, at its own expense, secured all the requisite approvals for sale of the Clubhouse in the United States.

24. To boost sales, International Brands recognized that Clubhouse needed to be aggressively marketed to the golf community. Again in reliance on its exclusive distributorship agreement, International Brands, at its own expense, developed promotional materials and aggressively marketed Clubhouse through advertising, promotions and local distributor incentives. By way of example, attached as Exhibit 20 is information disseminated by International Brands to local distributors concerning promotions run by International Brands in 1997 with the knowledge of and input from OSA.

25. I kept OSA fully aware of International Brands efforts in promoting the sale of Clubhouse in the United States; OSA even requested to purchase some of International Brands' promotional materials for use in other markets. Copies of correspondence between International Brands and OSA addressing these issues are annexed as Exhibits 21-25.

26. As a result of International Brands' marketing efforts, its local distributors increased their orders of Clubhouse and International Brands, in turn, increased its purchases from OSA. From 1994 through 1998 International Brands' annual purchases of OSA products (primarily Clubhouse) from OSA grew from roughly 1700 cases in 1994 to over 10,000 cases in 1998 (a portion of which was delivered in 1999). Indeed, International Brands' sales of OSA's products, primarily "Clubhouse," grew to the point where such sales accounted for more than 25% of International Brands' business.

27. In late 1988, Robert Haswell and I agreed that the labeling, packaging and bottle for the 750ml Clubhouse product should again be restyled, essentially creating a newer, more attractive Clubhouse product. First, the 750ml bottle was redesigned. That occurred in January 1999 (annexed as Exhibit 26 is a copy OSA's January 20, 1999 fax transmitting to me for review the new bottle design). International Brands then undertook, at its own expense, to restyle the label and packaging of the product and launch a major promotional and advertising campaign in the United States for the "new" Clubhouse product.

28. In connection with the restyling of the 750ml Clubhouse product, International Brands, at its own expense, and with the knowledge and encouragement of OSA, engaged a highly regarded creative designer, Matt Klim, to redesign various aspects of the Clubhouse bottle label, gift box and shipping carton. Attached as Exhibits 27-29 are copies of correspondence exchanged by International Brands and OSA regarding Mr. Klim's activities in designing the new Clubhouse bottle label (the "Carol" whose handwriting appears in Exhibit 29 is Carol Latter, OSA's corporate secretary).

29. International Brands, at its own expense, and with the knowledge and encouragement of OSA, also engaged Mr. Klim to create designs and layouts for product brochures, sell sheets and advertisements. Additional detail concerning those activities will be submitted by Mr. Klim through his affidavit.

30. International Brands, at its own expense, and with the knowledge and encouragement of OSA, also engaged Mr. Klim to create promotional items such as pocket knives, golf shirts, golf gloves and tee shirts to generate interest in and sales of the product. Additional detail concerning these activities will be submitted by Mr. Klim through his affidavit.

31. International Brands, at its own expense, and with the knowledge and encouragement of OSA, also engaged Mr. Klim to create point of sale materials such as banners, posters, floor stands, "shelf takers," "table tents," "Bar Cards," stir sticks, and other product displays. Additional detail concerning these activities will be submitted by Mr. Klim through his affidavit.

32. Both Robert Haswell and Julian Haswell were frequently informed by me of Mr. Klim's activities with regard to the Clubhouse product.

33. The promotional and point of sale materials designed by Mr. Klim were manufactured by various companies at International Brands' expense. Attached as Exhibit 30 is a ledger prepared by International Brands based upon a review of billing and payment records summarizing the amounts paid by International Brands during 1998-2001 for promotional and point of sale material and for some of the expenses associated with promotional events funded by International Brands.

34. In connection with the introduction of the new Clubhouse product to the U.S. market in late 2000, International Brands engaged Result Advertising and Marketing ("Result") to conduct an advertising and marketing campaign in Southern Florida, which included a series of promotional events aimed at consumers. Result's fees totaled $129,500. A copy of Result's September 7, 2000 invoice, which was paid in full by International Brands, is attached as Exhibit 30A.

35. On November 6, 2000, OSA reported that it was prepared to commence full scale production of the new Clubhouse product upon my approval of the artwork for the new gift carton. A copy of Mr. Haswell's November 6, 2000 fax is attached as Exhibit 31.

36. Accordingly, beginning in December 2000, International Brands, at its own very substantial expense, and with the knowledge and encouragement of OSA, purchased advertising

space in Golf Magazine, Senior Golfer and similar publications and arranged to have full-page color advertisements run in a series of issues. Attached as Exhibits 32-40 are the cover pages of various publications in which the Clubhouse advertisement ran, along with copies of the advertisement.

37.   I frequently advised Robert Haswell and Julian Haswell of the efforts and substantial expense International Brands was incurring in designing, promoting and advertising the new Clubhouse product.

**CHANGE OF CONTROL AT OSA**

38.   In August 2000, Robert Haswell passed away. Shortly after Mr. Haswell's death, Julian Haswell advised me that he had assumed the duties of "Managing Director" and that Roger Turner, a consultant that had been hired by Robert Haswell prior to his death, was serving as "Chairman."

39.   In early 2001, Julian Haswell proposed to me a production schedule and pricing for 4,650 cases of the new 750ml Clubhouse product, which would represent International Brands' first order of the new product. Julian Haswell's proposed pricing was 20 pounds sterling, per case, for the first 1,000 cases; 18 pounds sterling, per case, for the balance of 3,650 cases ("20/18 Price").

40.   On January 26, 2001, International Brands submitted a formal purchase order for 4,650 cases of the new 750ml Clubhouse product at a price of 18 pounds sterling per case ("18 Price") for each of the 4,650 cases, the $2 per case "difference" on the first 1,000 cases being intended to help defray International Brands' substantial advertising expense. A copy of International Brands' purchase order (the "4,650 Case Order") is annexed as Exhibit 41.

41.     OSA accepted International Brands' 4,650 Case Order and, by fax dated February 2, 2001 (a copy of which is annexed as Exhibit 42), Julian Haswell indicated that production was about to begin.

42.     By letter dated February 26, 2001 (a copy of which his annexed as Exhibit 43), Julian Haswell requested that International Brands wire to OSA's bank 26,045 pounds sterling to "help pay the cost of the bulk whisky I have purchased for your order of 4,650 cases which is now becoming due for payment" (hereinafter the "bulk whisky advance").

43.     I agreed on behalf of International Brands to advance such funds as a credit against the purchase price of the 4,650 Case order and, on March 9, 2001, I caused International Brands to wire to OSA's bank $40,549.01 (equating to 28,355 pounds sterling) representing the bulk whisky advance.  Receipt of the wire was confirmed by fax from OSA's controller, Nik Messett, dated March 9, 2001 (a copy of which is annexed as Exhibit 44).

44.     The first 1,200 cases of the 4,650 Case Order were shipped to International Brands in April 2001.  International Brands applied the cost of that shipment (which OSA invoiced at 23,600 pound, representing the 20/18 Price rather than the agreed 18 Price) to the very substantial balance due from OSA for defective goods (discussed below) and the bulk whisky advance.

45.     By fax dated June 5, 2001 (a copy of which is annexed as Exhibit 45), Julian Haswell requested payment for 783 additional cases of 750ml Clubhouse which were purportedly ready for shipment.

46.     By letter dated June 8, 2001 (a copy of which is annexed as Exhibit 46), I reminded Julian Haswell that International Brands had a credit balance in its favor of 55,302

-11-

pounds sterling for (i) defective goods (including goods that had been returned to OSA at OSA's request), and (ii) the bulk whisky advance.  That credit advance was sufficient to cover the cost of the 1,200 cases that had been shipped, the 783 cases that were purportedly ready for shipment and an additional plus an additional 1,000 cases.

47.    By fax dated June 22, 2001 (a copy of which is annexed as Exhibit 47), International Brands requested that in addition to the 783 cases of 750ml Clubhouse that had purportedly been produced, OSA ready an additional 1,617 cases so that a 2,000 case container could be loaded and shipped.

**Facts Pertaining to Julian Haswell's Termination of the Exclusive Distributorship Agreement**

48.    By fax dated June 25, 2001 (a copy of which is annexed as Exhibit 48), Julian Haswell responded to my June 22nd fax and advised me that OSA would not produce any more cases of 750ml Clubhouse until it received from International Brands payment for the 783 cases it was holding.  Given the very substantial amount owed to International Brands by OSA, the fact that International Brands had spent over $1,000,000 to develop and market the new Clubhouse product and my substantial concern regarding OSA's financial condition, I insisted that OSA apply the credits due International Brands to the 4,650 Case Order.

49.    Separately, during the summer of 2001, Roger Turner, acting on behalf of Robert Haswell's widow, Ann Haswell (Julian Haswell's stepmother), and I engaged in negotiations concerning International Brands' purchase of the Estate's majority interest in OSA.  I felt that by purchasing such a stake in OSA, International Brands could protect its own investment in OSA's products.

50. Mr. Haswell was aware of my negotiation with Mr. Turner. In fact, I later learned from Mr. Turner and from Julian Haswell that Mr. Haswell was annoyed by what he perceived as my interference in his efforts to negotiate his own purchase of OSA from his stepmother.

51. My negotiations with Mr. Turner did not reach fruition and Ann Haswell eventually sold the Estate's shares of OSA to Julian Haswell.

52. By letter dated October 1, 2000 (a copy of which is attached as Exhibit 49), I sought to resolve the issue of International Brands' credits and secure delivery of the balance of the 4,650 Case Order. I reminded Julian Haswell and Roger Turner of the very substantial investment International Brands had made in promoting OSA products and detailed the various amounts owed by OSA to International Brands.

53. I heard nothing for almost two weeks. Then on October 12, 2001, I received a fax from Julian Haswell (a copy of which is attached as Exhibit 50) which did not address my October 1st letter, but rather advised that he had successfully concluded the purchase of OSA from his father's estate and wished to "negotiate the future of OSA's products in the U.S." Mr. Haswell's letter included a bill to International Brands for 15,035.70 pounds sterling. None of the charges on that bill had been agreed to by International Brands or previously invoiced by OSA to International Brands. Nevertheless, Julian Haswell refused to ship the balance of the 4,650 Case Order unless International Brands paid OSA's contrived bill. Additionally, Mr. Haswell's letter referred to International Brands as a "customer" -- the first time OSA had, to my knowledge, characterized International Brands in such terms.

54. By letter to Julian Haswell dated November 16, 2001 (a copy of which is annexed as Exhibit 51), I objected to October 12th bill, and insisted that International Brands credits be

honored. I also reiterated in that letter International Brands' desire to take the balance of the 4,650 case order. The balance of the 4,650 case order was never shipped.

55. By letter dated November 21, 2001 (a copy of which is annexed as Exhibit 52), Julian Haswell advised me that "with immediate effect, Old St. Andrews will no longer be supplying their products to International Brands, Inc. as a customer. . ." The three grounds asserted by Mr. Haswell for terminating its relationship with International Brands were fictitious:

    A.    International Brands had never been advised by OSA that it was disappointed in its sales; to the contrary OSA had consistently acknowledged our growth of the U.S. market.

    B.    International Brands regularly provided information to OSA regarding depletions and inventories.

    C.    International Brands consistently informed OSA of when and to whom OSA products were being sold.

56. Prior to Julian Haswell's purchase of OSA no representative of OSA ever suggested to me that International Brands was merely a "customer" of OSA. To the contrary, OSA consistently acknowledged International Brands as its exclusive distributor and, based on my knowledge of the industry, has never sold Old St.Andrews products to any other distributor in the United States (other than "duty free" shops) after issuing the August 2, 1989 appointment letter.

57. The summary termination of International Brands as OSA's exclusive United States distributor, without compensation for International Brands investment in the Old St.

Andrews Brand did not comport with the recognized custom and practice prevalent in the United States distilled spirits industry with respect to the rights of exclusive distributors.

58. Between 1999 and November 2001 International Brands spent the following amounts advertising and promoting Clubhouse prepatory to the introduction of the new Clubhouse 750ml product:

| | |
|---|---|
| Expenses incurred by International Brands in purchasing promotion products and financing various promotional events during 1999-2001 (see Exhibit 30 and 30A) | $ 604,829.66 |
| Expenses of Klim Design in creating the artwork for the new Clubhouse Gift Carton, creating the various magazine ads and creating the promotional and point of sale products used to market Clubhouse Scotch whisky (see Klim Affidavit) | $ 359,727.53 |
| Expenses of running full page ads in Golf Magazine, ATT Magazine, U.S. Open Magainze, Met Golfer and Beverage Media (see Klim Affidavit) | $ 523,397.70 |
| | $1,487,954.80 |

59. During the period 1999 – 2001, International Brands realized profits on sales during that period of only $154,412.89.

60. International Brands therefore seeks to recover $1,333,542 calculated as follows:

Development/Advertising/Promotional Expenses 1999 – 2001     $1,487,954.80
Profits 1999 – 2001                                                                       $ (154,412.89)
                                                                                                        $1,333,542.00

plus the bulk whisky advance and the amount of its invoice for defective goods.

**Facts Concerning Credits Due International Brands for Defective Goods**

61.     From time to time, OSA shipped to International Brands goods that were defective by reason of their bottling, packaging or labeling. OSA would accept return of such goods and credit International Brands for their cost.

62.     By fax dated August 16, 1999 concerning a shipment of defective 750ml bottles (a copy of which is annexed as Exhibit 53), I advised Robert Haswell that government inspectors had also determined that the labels on the 50ml white golf ball shaped bottles of Old St. Andrews "Classic" ("50ml Classic") stored in our warehouse failed to conform to law as they did not designate the product as Scotch whisky. Mr. Haswell promptly agreed that the defectively labeled product could be returned to OSA for credit.

63.     I secured permission from the United States Bureau of Alcohol Tobacco and Firearm ("BATF") to liquidate International Brands' inventory of 50ml Classic until January 1, 2000, later extended to March 30, 2000.

64.     In terms of the 50ml Classic already in the hands of wholesalers, the State of Virginia (which controls the sale of alcohol in that state) required that International Brands' local distributor either recover the product from roughly 180 state liquor stores or issue a "depletion allowance" so that the state could accelerate the sale of the product. Any such depletion allowance would be charged back to International Brands.

65.     After discussions between me, Robert Haswell and Julian Haswell on this issue, Robert Haswell and Julian Haswell agreed that OSA would credit International Brands for the amount of any depletion allowance issued by International Brands' local distributor to the State of Virginia. On this basis, International Brands elected to have the 50ml Classic liquidated by the State

of Virginia rather than recover the product from 180 state liquor stores and returning same to OSA for full credit.

66. In April 2000, OSA requested that International Brands make arrangements for the return of International Brands' remaining stock of mislabeled 50ml Classic. Copies of correspondence between me and the Haswells on this issue is annexed as Exhibit 54.

67. By fax dated June 19, 2000 (a copy of which is annexed as Exhibit 55), I advised Julian Haswell that International Brands would be returning to OSA 212 cases of mislabeled Classic.

68. By fax dated June 26, 2000 a copy of which is annexed as Exhibit 56, Julian Haswell approved the shipping costs that had been quoted to International Brands and agreed to accept the return of the 212 cases.

69. On July 15, 2000, International Brands rendered to OSA the following credit invoices:

| | |
|---|---|
| Inv. 715 - $28,857.00 | Reimbursement for the cost (purchase price plus shipping costs and taxes) of 212 cases of ml classic returned to OSA. |
| Inv. 716 - $ 9,046.64 | Reimbursement for cases of 50ml Classic sold pursuant to a depletion allowance permitted by the State of Virginia or returned from Virginia distributors. |
| $37,903.64 | |

A copy of Invoice 715 is annexed as Exhibit 57. A copy of credit invoice 716 is annexed as Exhibit 58.

70.     OSA never objected to these July 15, 2000 invoices until International Brands insisted in June 2001 that the invoices be applied to the cost of the 4,650 Case Order. OSA has failed to pay Invoices 715 and 716.

### Summary of International Brands Claim

71.     International Brands aggregate monetary claim against OSA (exclusive of punitive damages and attorneys' fees) is as follows:

| | |
|---|---:|
| Expenses associated with developing, advertising and promoting the new Clubhouse product | $1,333,542.00 |
| Unreimbursed bulk whisky advance less invoiced price of 1,200 cases of 750ml Clubhouse delivered by OSA in April 2001 | 6,801.01 |
| Outstanding Invoices 715 and 716 | 37,903.64 |
| | $1,378,246.65 |

/s/ Rolf Andersen
Rolf Andersen

Subscribed and sworn to me this
8th day of May 2004.

/s/ Notary Public
Notary Public